IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| THOR HIGGINBOTHAM, | ) | CASE NO. 1:23-CV-1526 |
| Plaintiff, | ) | |
| vs. | ) | JUDGE JAMES S. GWIN |
| | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| COMMISSIONER OF SOCIAL SECURITY, | ) | |
| Defendant. | ) | **REPORT & RECOMMENDATION** |

Plaintiff, Thor Higginbotham ("Higginbotham"), challenges the final decision of Defendant, Commissioner of Social Security ("Commissioner"), denying his application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, and 1381 *et seq*. This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation. For the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final decision be REVERSED AND REMANDED for further proceedings consistent with this opinion.

## I. PROCEDURAL HISTORY

Higginbotham filed an application for SSI on March 18, 2021. Transcript ("Tr." 181-86) He alleged a disability onset date of November 1, 2015, and claimed disability due to epilepsy, learning disabilities, ADHD, and severe anxiety. (Tr. 60) His application was denied initially and upon reconsideration, and he requested a hearing before an administrative law judge ("ALJ"). (Tr. 59-81,

1

104) A telephonic hearing was held on September 28, 2022. (Tr. 30-58) At the hearing, Higginbotham requested the ALJ consider a closed period of disability from March 18, 2021, to March 18, 2022. (Tr. 35) ALJ Melody Paige issued an unfavorable decision on October 27, 2022. (Tr. 14-25) The Appeals Council denied review of the decision on June 7, 2023. (Tr. 1-3)

Higginbotham then filed the instant Complaint challenging the Commissioner's final decision. (Doc. No. 1) The parties have completed briefing in this case. (Doc. Nos. 6, 8, 9) In his brief, Higginbotham lists one assignment of error:

> The ALJ erred at step 2, and the finding that Plaintiff had no severe medically determinable impairments was unsupported by substantial evidence. The ALJ erred in her evaluation of the medical opinions and evaluation of Plaintiff's subjective allegations.

(Doc. No. 6 at 1)

## II. EVIDENCE

### A. Personal and Vocational Evidence

Higginbotham was born in 1998 and was 22 years-old at the time his application was filed, making him a "young individual age 18-49" under social security regulations. (Tr. 213) *See* 20 C.F.R. § 416.963. He has a history of special education and completed schooling through the 11th grade. (Tr. 195, 227-37, 349-66) He has a work history as a gas station clerk, grocery courtesy clerk, factory laborer, and call center sales representative. (Tr. 195-96)

### B. Relevant Medical Evidence[1]

#### 1. Treatment Notes

On January 25, 2020, Higginbotham presented to the Emergency Department ("ED") after his mother witnessed him experience 4-5 seizures. (Tr. 381, 385) EMS reported that Higginbotham

---

[1] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' briefs that is relevant to the Court's determination.

was postictal when they arrived.[2] (Tr. 384) On arrival in the ED, Higginbotham had difficulty communicating, appeared in distress, was nauseous and vomiting. (Tr. 381, 384) It was noted that Higginbotham was treated for seizures (epilepsy) in the summer of 2017 but had discontinued taking his medication and had not followed-up with a neurologist because he lost his medical insurance and felt "nobody would do anything for him." (*Id.*) He was diagnosed with seizures, administered an anticonvulsant (Keppra), and advised to follow-up with a neurologist. (Tr. 384)

On March 10, 2020, Higginbotham presented to neurologist Gubert Lee Tan, M.D. for seizure treatment. (Tr. 369-73) He reported that he had experienced one seizure since his ED visit which left him weak, nauseous, and with head pain. (*Id.*) It was noted that his past medical history was "significant for mood changes and seizures." (Tr. 370) He reported averaging 2-3 seizures per week. (*Id.*) He also reported restarting Keppra 500 mg about a month prior. (*Id.*) A physical exam and MRI were unremarkable (*Id.*) He was advised not to drive. (Tr. 372) He was also advised to continue Keppra but warned that the medication increased risk of suicide and suicidal ideation. (*Id.*)

On November 17, 2020, Higginbotham again was transported to the ED by EMS after experiencing a seizure. (Tr. 269) It was reported that his girlfriend witnessed Higginbotham fall from standing and have tonic-clonic convulsions. (*Id.*) He sustained lacerations to his scalp and left eye. (*Id.*) Higginbotham was "unresponsive on arrival" to the ED. (*Id.*) After becoming responsive, Higginbotham reported experiencing seizures on a weekly basis and reported not complying with his medication. (Tr. 273) He was admitted for overnight observation due to a suspected concussion from his fall. (Tr. 273-74) His dosage of Keppra was increased to 750 mg. (Tr. 406) An EEG the

---

[2] "The postictal state is a period that begins when a seizure subsides and ends when the patient returns to baseline. It typically lasts between 5 and 30 minutes and is characterized by disorienting symptoms such as confusion, drowsiness, hypertension, headache, nausea..."
https://www.ncbi.nlm.nih.gov/books/NBK526004/#:~:text=The%20postictal%20state%20is%20a,%2C%20headache%2C%20nausea%2C%20etc..

following day was unremarkable finding "no clear epileptiform discharges or ictal activity." (Tr. 275)

On January 11, 2021, Higginbotham returned to the ED after a seizure witnessed by a third party. (Tr. 276) It was reported that he was "adjusting his Keppra due to breakthrough seizures" and that he was taking 750 mg of Keppra twice a day. (Tr. 276) The level of Keppra in his blood was flagged as low. (Tr. 437) The top of his scalp was tender and a cervical collar was put in place. (Tr. 278) He was diagnosed with breakthrough seizure and closed head injury. (Tr. 281)

On March 30, 2021, shortly after his alleged disability onset date, Higginbotham treated with Leeanne Adele Thomas, CNP of Neurological Physicians. (Tr. 471-75) He reported that three weeks prior he had back-to-back seizures witnessed by his mother. (Tr. 472) He stated that when he is compliant with medication, he does not have seizures but missed a lot of recent doses due to stress caused by deaths in his family. (Tr. 474) He reported depression, anxiety, and recent suicidal ideation but did not want to talk for fear of being locked up and "strapped down." (*Id.*) He was escorted to the emergency room based upon provider concerns for severe depression. (*Id.*)

He returned to CNP Thomas on June 17, 2021, stating that his last seizure was 1-2 months prior. (Tr. 476-80) He also reported memory issues, insomnia, and lightheadedness. (Tr. 476) It was noted that he was stable on Keppra 750 mg and he reported compliance with his medication. (Tr. 476-78) Seizure precautions and safety measures were discussed at length. (Tr. 476-77)

On October 20, 2021, a provider's note stated that Higginbotham "wanted his appointment moved up because of having a seizure today." (Tr. 546) On October 29, 2021, Higginbotham again treated with CNP Thomas for seizures, as well as depression, sleep disorder, and migraines. (Tr. 528-31) His last seizure was noted as "September or the beginning of October 2021" and it was noted to have occurred "in the setting of him forgetting to take his medication." (Tr. 529)

4

On January 26, 2022, Higginbotham returned to CNP Thomas. It was noted that his last seizure was two weeks prior with two episodes that were 30 minutes apart, witnessed by his girlfriend. (Tr. 514, 516) There were no other seizures since last follow-up. (Tr. 514) He admitted missing a dose of his Keppra and it was noted he had a "history of breakthrough seizures with missed doses of medication" but "[o]ther than the occasional missed dose he is compliant with his medication." (Tr. 516) The following seizure safety tips were given: "avoid driving" until "seizure free for 6 months; "avoid unprotected heights such as working on ladders, especially if seizures are not controlled" and caution around open waters or open flames. (Tr. 529, 524)

### 2. Medical Opinions

**CNP Thomas.** In September 2021, CNP Thomas completed a Physical Residual Functional Capacity Questionnaire. (Tr. 506) She opined that Higginbotham could continuously sit, stand and walk. *Id.* She opined that his symptoms may "occasionally" limit his attention and concentration, if he has a breakthrough seizure. *Id.* She also estimated that he may miss one to two days a month due to seizures. *Id.*

**Dr. Ekstrand.** In July 2021, Higginbotham presented for a consultative examination with Dylan Ekstrand, D.O. (Tr. 498-505) Higginbotham reported that he had memory deficits which caused difficulty in remembering to take his seizure medications. (Tr. 503) He also reported having a seizure two months prior and having restrictions placed on his driving, climbing, and heavy lifting by his neurologist. (*Id.*) A physical examination was largely normal showing that he walked with a normal gait without the use of an assistive device, had full strength, and unremarkable neurological findings. (Tr. 504) Dr. Ekstrand concluded that Higginbotham (a) should be able to walk for six hours out of an eight-hour day, (b) could probably be on his feet for a combined total of six hours

5

out of an eight-hour day and (c) could carry less than 30 pounds frequently and more than 50 pounds on occasion. (Tr. 505)

**State Agency Review.** On July 29, 2021, State agency physician Steve McKee, M.D., reviewed the medical evidence and concluded that Higginbotham had no exertional limitations but could not climb ladders, ropes and scaffolds, and should avoid all exposure to hazards. (Tr. 65-66) Dr. McKee also found that Higginbotham's epilepsy constituted a severe impairment under agency guidelines, as well as his anxiety, learning disorder, substance addiction, and ADHD. (Tr. 63)

On reconsideration, Lynne Torello, M.D. agreed that epilepsy constituted a severe impairment and that Higginbotham should not climb ladders, ropes and scaffolds, and should avoid all exposure to hazards. (Tr. 74-77)

**C.     Hearing Testimony**

On September 28, 2022, ALJ Melody Paige held a telephonic hearing on Higginbotham's application. (Tr. 30-58) Higginbotham represented by counsel, and an impartial vocational expert ("VE") testified. (*Id.*) Higginbotham's counsel presented an opening statement and expressed that it took Higginbotham about a year to get the dosage of his seizure medication regulated. (Tr. 34) After doing so, he started working and obtained employment around April 2022. (*Id.*) Accordingly, counsel asked for a closed period of disability from March 2021 through March 2022. (Tr. 35) Higginbotham then testified to the following:

- He has never held a driver's license and was nervous to drive due to his seizures. He walks to his current job and gets rides for other activities. He finished school through the 11th grade and was in special education classes.

- On a normal day during the alleged period of disability, he slept all day or played video games and cleaned the house. He drank beer on the weekends and smoked marijuana every 3-5 days. He stated he does not have problems lifting, bending, stooping, crouching, crawling, or breathing. But, during the period at issue, had difficulties lifting heavy objections and bending down as those activities would at times trigger seizures. He also stated that he slept most of the day at times because

> his seizures made him drained. He also has migraines which he believed he developed due to his seizures.

- He stopped working in 2021 after having a seizure while on the job. He woke up on the floor at work after being unconscious for an hour or two and was taken to the hospital by ambulance. His manager called and fired him that day because he was a "liability" due to his seizures. The ALJ asked why he did not get an ADA accommodation and he replied that he was "uneducated" and did not know that he could do anything about it. He also testified about subsequent seizures during the period including one where an ambulance came to his house and he required stitches to his head after injuring himself during the seizure. His doctor increased his anticonvulsant (Keppra) dosage to 750 mg. He also took medication at times for anxiety, depression, nausea, and dizziness.

- He said his last seizure was in April and he has experienced medical improvement with his seizures and mental health impairments. As a result ,he has been working full-time for Ashland Lake Erie since April 2022

(Tr. 37-54)

VE Elizabeth Pasikowski also testified at the hearing. (Tr. 54-). The ALJ posed a hypothetical to the VE asking if there would be work for an individual who could lift 5-10 pounds, stand /walk six hours in a workday, sit for two hours in a workday, and not stand for any period of time. (Tr. 57) The VE replied that there would be no jobs for such an individual. (*Id.*)

### III. STANDARD FOR DISABILITY

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4). *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b) *and* 416.920(b). Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) *and* 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at

7

923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

### IV. SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant engaged in substantial gainful activity during the following periods: the fourth quarter of 2020 (20 CFR 416.920(b) and 416.971 et seq.).

2. However, there has been a continuous 12-month period(s) during which the claimant did not engage in substantial gainful activity. The remaining findings address the period(s) the claimant did not engage in substantial gainful activity.

3. The claimant has the following medically determinable impairments: depression, anxiety, a seizure disorder, cannabis and alcohol use disorders, and a learning disorder (20 CFR 416.921 et seq.).

4. The claimant does not have an impairment or combination of impairments that has significantly limited (or is expected to significantly limit) the ability to perform basic work-related activities for 12 consecutive months; therefore, the claimant does not have a severe impairment or combination of impairments (20 CFR 416.921 et seq.).

5. The claimant has not been under a disability, as defined in the Social Security Act, since March 18, 2021, the date the application was filed (20 CFR 416.920(g)).

(Tr. 19-24)

## V. STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v.Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also His v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.") This is so because there is a "zone of choice" within which the Commissioner can act,

without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D.Ohio July 9, 2010).

## VI. ANALYSIS

Higginbotham argues that the ALJ made multiple errors at step two of the sequential evaluation process. (Doc. No. 6 at 11-25)

A.     **Standard of Law**

At step two of the sequential evaluation process, an ALJ must evaluate whether a claimant has a "medically determinable physical or mental impairment." 20 C.F.R. § 404.1520. A medically determinable impairment ("MDI") "results from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques" and "must be established by objective medical evidence from an acceptable medical source." 20 C.F.R. § 404.1521. The impairment must also meet the durational requirement—"it must have lasted or must be expected to last for a continuous period of at least 12 months." 20 C.F.R. § 404.1520. If the ALJ finds that the claimant has a medically determinable impairment ("MDI"), then the ALJ determines whether that impairment is severe or non-severe. *Id.* "Once one severe impairment is found, the combined effect of all impairments must be considered [in determining the claimant's residual functional capacity], even if other impairments would not be severe." *White v. Comm'r of Soc. Sec.*, 312 F. App'x 779, 787 (6th Cir. 2009).

The regulations define a severe impairment as one that significantly limits the ability to perform basic work activities. 20 C.F.R. § 404.1520(c). The severe impairment requirement is a threshold element which plaintiff must prove in order to establish disability within the meaning of the Act. *Gist v. Sec'y of H.H.S.*, 736 F.2d 352, 357 (6th Cir. 1984). An impairment will be considered non-severe if it "does significantly limit your physical or mental ability to do basic work activities." 20 C.F.R. § 404.1522. Examples of "basic work activities" are "abilities and aptitudes necessary to do most jobs," such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;" "seeing, hearing, and speaking;" "understanding, carrying out and remembering simple instructions;" "use of judgment;" "responding appropriately to supervision, co-workers and usual work situations;" and "dealing with changes in a routine work setting." 20 C.F.R. § 404.1522(b).

The severity requirement is a "de minimis hurdle" in the sequential evaluation process. *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988). Although the standard is de minimis, it is the claimant's burden at step two and a diagnosis alone "says nothing about the severity of the condition." *Id. see also Despins v. Comm'r of Soc. Sec.*, 257 F. App'x 923, 930 (6th Cir. 2007) ("The mere existence of those impairments, however, does not establish that [claimant] was significantly limited from performing basic work activities for a continuous period of time.").

**B.     Analysis**

The ALJ found that Higginbotham had the following medically determinable impairments ("MDIs"): depression, anxiety, a seizure disorder, cannabis and alcohol use disorders, and a learning disorder. (Tr. 19). Nonetheless, the ALJ found that none of Higginbotham's MDIs were "severe" under the regulations and he was not disabled. (Tr. 19-20) Thus, the ALJ concluded the sequential evaluation at step two. Higginbotham argues that the ALJ's determination is not supported by substantial evidence and lacks an accurate and logical bridge. He further argues that the ALJ erred in evaluating the medical opinion evidence and his subjective complaints.

During the closed period of disability (March 2021-March 2022) Higginbotham sought regular treatment for his seizure disorder from Leanne Adele Thomas, CNP of Neurological Physicians. He had visits with CNP Thomas on the following dates: March 30, 2021 (471-75), June 17, 2021 (Tr. 476-80), October 29, 2021 (Tr. 528-46), January 26, 2022 (Tr. 513-24)  At each of these visits Higginbotham reported experiencing seizures prior to the visit. (*Id.*) After his June 2021 visit, he was not scheduled to see CNP Thomas for another 6-months (December 2021). (Tr. 476) However, on October 20, 2021, Higginbotham requested his visit be moved up due to experiencing a seizure that day and he was seen by CNP Thomas on October 29, 2021. (Tr. 528, 546)

CNP Thomas filled out a medical form in September 2021, that stated "if he has a breakthrough seizure," his symptoms would occasionally interfere with his ability to maintain concentration and attention (Tr. 506) CNP Thomas also estimated that Higginbotham would likely miss 1-2 days a month due to his seizure disorder. (*Id.*) In assessing CNP Thomas' opinion the ALJ found as follows:

> Treating nurse practitioner LeeAnne Thomas CNP offered a set of opinion statements in late 2021. She noted the claimant could continuously sit, stand and walk, and that his symptoms may "occasionally" limit his attention and concentration, if he has a breakthrough seizure. She also noted the claimant may miss one to two days a month due to seizures but that this opinion was an estimate (10F). These findings are somewhat persuasive. Ms. Thomas is a treating source, and her opinions are fairly speculative. She premises her opinions on the possibility of breakthrough seizures and an estimate of their possible occurrence. Given that the claimant has not presented for care after a seizure since the date this application was filed, it would appear that the claimant is simply not very limited by his seizures.
>
> The undersigned also considered recommendations from treating clinicians that the claimant is to avoid driving and a range of hazards if he continues to have seizures or experiences side effects of seizure medication (11F/29-30). While these recommendations were offered by a treating clinician, there is no evidence of office visits for seizures after the claimant filed the instant claim, and EEG testing has been negative. The claimant has also denied side effects from Keppra and there are admissions it is effective. The evidence shows that proper adherence to Keppra obviates these restrictions.

(Tr. 24)

In addition to CNP Thomas, three other doctors opined that Higginbotham's seizures caused work limitations. On July 16, 2021, consultative examiner Dr. Ekstrand found that Higginbotham's seizures caused sitting, standing, and carrying limitations. (Tr. 489-505) The ALJ found Dr. Ekstrand's opinion "only minimally persuasive" and explained:

> There is insufficient evidence to suggest a need for limitations of any kind given the many normal findings on physical exams, the normal EEG testing, and the reported efficacy of Keppra. His care has been overwhelmingly routine and conservative, and he has returned to full time work as well.

13

(Tr. 24) Two state agency physicians also determined that Higginbotham's seizures (1) constituted a severe impairment under agency guidelines and (2) resulted in the following limitations: avoiding all exposure to hazards and never climbing ladders, ropes, and scaffolds. (Tr. 63, 66, 74, 76-77). In rejecting the state agency opinions, the ALJ stated, "these examiners overstated the claimant's limitation given his lack of documented seizures during the relevant period, the normal EEG studies, and his lack of care for his mental impairments." (Tr. 23-24)

The ALJ's assessment of the above medical opinions requires remand because it contains inaccuracies and fails to build an accurate and logical bridge between the evidence and the result. The ALJ discounted CNP Thomas' opinion because Higginbotham "has not presented for care after a seizure since the date this application was filed" and "there is no evidence of office visits for seizures after the claimant filed the instant claim." (Tr. 24) These statements are incorrect. As noted earlier, Higginbotham presented for care with CNP Thomas after seizures in March, June, and October 2021, as well as in January 2022. (Tr. 471-80, 513-46). It was also noted that on October 20, 2021, Higginbotham called CNP Thomas' office asking to have his appointment moved up by several months due to a seizure that day. (Tr. 546) Thus, the ALJ erred in stating Higginbotham did not present for care after seizures and that he had no evidence of office visits for seizures.

The Commissioner contends that the ALJ's statement that Higginbotham did not present for seizure care relates to an earlier statement in the ALJ's opinion that "the evidence shows he did not present to the ER" after seizures. (Doc. No. 8 at 14-15 citing Tr. 21) Thus, the Commissioner puts forth that when the ALJ stated "there is no evidence of office visits for seizures after the claimant filed the instant claim," (Tr. 24) the ALJ meant that there was, "no evidence of *ER* visits for seizures." However, this not what was stated and the Commissioner has engaged in impermissible *post hac rationalization.*

14

The Commissioner also errs in stating Higginbotham's last hospitalization for seizure was November 2020. (Doc. No. 8 at 15) As Higginbotham pointed out and the evidence shows, Higginbotham presented to the ER after a seizure in January 2021, just a few months before the alleged onset date. (Doc. No. 6 at 6 citing Tr. 276-81, 431-50). The Commissioner's statement that, "Plaintiff reported seizures in late 2021 but again he did not seek treatment following the episode and only reported them to Nurse Thomas at scheduled follow up visits. Tr. 514, 529," is also incorrect. (Doc. No. 8 at 15) As noted earlier, in October 2021 Higginbotham requested his appointment be moved up several months due to a reported seizure which CNP Thomas did. (Tr. 546).

The ALJ's opinion also contains a misstatement in her assessment of the State agency physician opinions. The ALJ stated the "examiners overstated the claimant's limitation given his lack of documented seizures during the relevant period, the normal EEG studies, and his lack of care for his mental impairments." (Tr. 23-24) However, as noted above, treatment notes contain consistent documentation of Higginbotham's seizures throughout the relevant period. If the ALJ meant something else by "documented seizures" than those reported in treatment notes it is unclear from the text of the decision. The Commissioner fails to address the ALJ's inaccurate statement. (Doc. No. 8 at 17-18)

Aside from the medical opinions, several other findings complicate review of the ALJ's step two seizure severity determination. For instance, the ALJ disregarded treating clinicians' recommendations that Higginbotham avoid driving and hazardous conditions because:

> [T]here is no evidence of office visits for seizures after the claimant filed the instant claim, and EEG testing has been negative. The claimant has also denied side effects from Keppra and there are admissions it is effective. The evidence shows that proper adherence to Keppra obviates these restrictions.

15

(Tr. 24) As explained above, the ALJ's determination that there were no "office visits for seizures after the claimant filed the instant claim" is false.

The ALJ also states Higginbotham's use of Keppra "obviates these restrictions." (Tr. 24) However, the ALJ's decision prevents meaningful review of this statement. Though Higginbotham stated several seizures have been caused by missed doses, the ALJ failed to discuss evidence that suggested Higginbotham also experienced seizures during periods of reported compliance. Despite discussing treatment records from January 2021 and June 2021, the ALJ fails to mention the reports in these records that Higginbotham was compliant with his medication at these times and still experiencing seizures. The January 2021 treatment record states that Higginbotham "has been adjusting his Keppra due to breakthrough seizures and today had a breakthrough seizure and struck his head on the countertop…He did take his Keppra this morning. He takes 750 mg twice a day." (Tr. 431) It was noted that after his November ER visit, Higginbotham's Keppra dosage was adjusted from 500 mg to 750 mg. (Tr. 406) Three months after his alleged onset date, in June 2021, Higginbotham again reported recent seizures despite "compliance with Keppra 750mg." (Tr. 476-78) Thus, the January and June 2021 treatment notes suggest that Higginbotham had some seizures despite compliance with his medication and the ALJ's failure to discuss this evidence does not permit meaningful review by this Court. At an earlier point in the decision, the ALJ does acknowledge that "most, if not all of the events coincide with noncompliance in taking his medication." (Tr. 21) However, this statement only further clouds the ALJ's severity determination. If the ALJ admits that some breakthrough seizures may have occurred despite compliance, than the ALJ's statement that compliance obviates a need for any restrictions is not supported by substantial evidence or at least presents this Court from conducting a meaningful review of the statement.

It is also notable that the ALJ failed to identify that the January 2021 visit, just a few months prior the alleged onset date, was an ER visit where Higginbotham sustained injury after he struck his head on the counter in the bathroom. (Tr. 447) Regarding the January 2021 visit the ALJ stated only that, "He reported another seizure in January 2021 and displayed tenderness to the paraspinal musculature of the neck, but neurological findings were wholly normal (3F/53-54)." (Tr. 23) As the ALJ, in part, discredited Higginbotham's seizures for "not presenting[ing] to the ER" after his alleged onset date. (Tr. 21) The ALJ's failure to discuss this ER visit is notable. The Commissioner does not address this issue. Instead, the Commissioner disregards the January 2021 visit in its brief and states in error that Higginbotham's last ER visit was in November 2020.[3] (Doc. No. 8 at 6). In addition to the misstatements in her opinion, the ALJ's failure to address portions of the record that challenged her findings (i.e., records that showed Higginbotham experienced seizures despite reported compliance and that her presented to the ER just prior to his onset date) also warrants reversal. *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 723–24 (6th Cir. 2014) ("[A]lthough the ALJ stated that she considered all the medical evidence...her reasoning shows that she discounted the severity of Gentry's conditions…by failing to address certain portions of the record."); *Minor v. Comm'r of Soc. Sec.*, 513 F. App'x 417, 435 (6th Cir. 2013) ("Instead of performing a proper analysis of the medical evidence under agency regulations and controlling case law, the ALJ cherry-picked select portions of the medical record to discredit Minor's complaints.") By failing to address contradictory evidence, the ALJ has not built a logical bridge from these treatment notes to her step-two determination.

---

[3] The Commissioner does not address the January 2021 ER visit and represents that Higginbotham's last ER visit for seizures was in November 2020 citing CNP Thomas' treatment notes. (Doc. No. 8 at 5). Though CNP Thomas' treatment notes stated that his last ER visit was November 2020, Higginbotham pointed out in his brief that his last ER visit for seizures was January 2021. (Doc. No. 6 at 6) and the January 2021 ER visit was well-documented in the record. (Tr. 276-81, 431-50)
.

17

A "claimant bears the burden of showing the severity of [his] impairments" *Curran v. Comm'r of Soc. Sec. Admin.*, No. 1:20-CV-02696, 2022 WL 1609222, at *8 (N.D. Ohio Feb. 16, 2022), report and recommendation adopted sub nom. *Curran v. Kijakazi*, No. 1:20-CV-02696, 2022 WL 1606287 (N.D. Ohio May 20, 2022). Nonetheless, the Sixth Circuit has stated that the severity determination is "a de minimis hurdle" to "screen out totally groundless claims." *Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008). In consideration of the de minimis standard, the ALJ's multiple misstatements, and her lack of discussion of the parts of treatment records that were not in alignment with her findings, the ALJ has failed to build an accurate and logical bridge between the evidence and (1) her medical opinion persuasiveness determinations; and (2) her determination that Higginbotham did not meet the Step Two *de minimis* hurdle as to his seizure disorder. As a rule, the ALJ must build an accurate and logical bridge between the evidence and the ALJ's conclusion. *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011); *see also Wilson v. Comm. of Soc. Sec.*, 378 F.3d 541, 544-546 (6th Cir. 2004). "Where the ALJ's decision lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Castello v. Commissioner of Social Sec.*, 5:09 CV 2569, 2011 U.S. Dist. LEXIS 13659, 2011 WL 610590, at *2 (N.D. Ohio Jan 10, 2011) (quoting *Giles v. Astrue*, 483 F.3d 483, 486 (7th Cir. 2007) (internal quotation omitted); *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995) (the ALJ's analysis must allow reviewing court to trace the path of reasoning) (*Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005)). Here, the ALJ's decision prevents meaningful review. Accordingly, it is recommended that the Commissioner's decision be remanded.

As the undersigned recommends reversal on the ALJ's step two determination related to Higginbotham's seizures, and in the interest of judicial economy, the undersigned will not address Higginbotham's remaining arguments.

## VII. CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be REVERSED AND REMANDED for further consideration consistent with this opinion.

Date: April 16, 2024

                                                 *s/ Jonathan Greenberg*
                                                 Jonathan D. Greenberg
                                                 United States Magistrate Judge

**OBJECTIONS**

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *Berkshire v. Beauvais*, 928 F.3d 520, 530-31 (6th Cir. 2019).**